Westlaw.

Slip Copy                                                                                                    Page 1
Slip Copy, 2007 WL 3037239 (C.A.6 (Ohio))
**(Cite as: Slip Copy)**

C

Gilchrest v. Unum Life Ins. Co. of America
C.A.6 (Ohio),2007.
Only the Westlaw citation is currently available.This case was not selected for publication in the Federal Reporter.Not for Publication in West's Federal Reporter See Fed. Rule of Appellate Procedure 32.1 generally governing citation of judicial decisions issued on or after Jan. 1, 2007. See also Sixth Circuit Rule 28. (Find CTA6 Rule 28)
United States Court of Appeals,Sixth Circuit.
Robert GILCHREST, Plaintiff-Appellant,
v.
UNUM LIFE INSURANCE COMPANY OF AMERICA; Government Liquidation.Com Long-Term Disability Plan, c/o Government Liquidation.com LLC, Defendants-Appellees.
No. 06-4143.

Oct. 17, 2007.

On Appeal from the United States District Court for the Southern District of Ohio at Columbus.

Before GUY, ROGERS, and McKEAGUE, Circuit Judges.
RALPH B. GUY, JR., Circuit Judge.
*1 Plaintiff Robert Gilchrest appeals from the judgment entered in favor of defendants Unum Life Insurance Company (Unum) and Government Liquidation.com Long-Term Disability Plan in this action challenging the termination of his long-term disability benefits under an employee benefit plan governed by the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1132(a)(1)(B). Plaintiff contests (1) the entry of judgment on the administrative record upholding the decision to terminate his benefits, and (2) the decision granting summary judgment to Unum on its counterclaim to recover overpayments due to his receipt of Social Security disability benefits. After review of the record and the applicable law, we affirm in part, reverse in part, and remand for entry of judgment consistent with this opinion.

I.

Gilchrest was employed by Government Liquidation.com (GLC) and participated in GLC's Long-Term Disability Plan (Plan), which was established and maintained pursuant to ERISA. Unum was the plan administrator and also paid benefits under the Plan. On June 18, 2003, Gilchrest, age 61, injured his back while lifting an air compressor at work. The medical findings, based on an MRI, included disc dessication at L3-S1, and complete obliteration of the right neural foramen at L4-5. Gilchrest received short-term disability benefits, and applied for and received Social Security disability benefits beginning January 1, 2004. When his eligibility for short-term disability benefits expired, Gilchrest applied for and began receiving long-term disability (LTD) benefits as of March 24, 2004.

Conservative treatment was not successful, and Gilchrest underwent decompressive laminectomy at L3-L5 in April 2004. In October 2004, much improved, Gilchrest was released to work with the restriction that he could not lift more than 25 pounds. His physician, Dr. Joseph Shehadi, completed Unum's "Estimated Functional Abilities Form" in November 2004. At that time, Dr. Shehadi indicated that Gilchrest could occasionally lift or carry 11 to 20 pounds, could occasionally push or pull 25 pounds, and could perform four hours per day of "light activity" and four hours per day of "sedentary activity." Dr. Shehadi added that Gilchrest was unable to lift more than 25 pounds at a time and was "unable to resume his highly physical job."There was no dispute concerning Gilchrest's restrictions, and Unum's medical reviewers agreed that these restrictions were reasonable and appropriate.

An occupational analysis obtained by Unum in June 2004, after Gilchrest's surgery but before he was released to work, concluded that Gilchrest's job was most closely analogous to the occupation of "Warehouse Manager" described in the Department of Labor's Dictionary of Occupational Titles

Exhibit F

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 3037239 (C.A.6 (Ohio))
(Cite as: Slip Copy)

Page 2

(DOT). Because "Warehouse Manager" was classified as "light" work requiring only occasional lifting of up to 20 pounds, Unum concluded that Gilchrest was not precluded from performing his "regular occupation" as that term was defined by the Plan. As a result, Unum terminated his LTD benefits effective October 12, 2004. Gilchrest appealed twice, but Unum reached the same conclusion in denials dated March 15, 2005, and August 25, 2005.

*2 The Plan also provided that disability benefits were to be reduced by "deductible sources of income," including, specifically, the amount an employee receives or is entitled to receive in Social Security disability benefits. Gilchrest alerted Unum when his disability payments were not reduced by the amount of Social Security benefits he was receiving, but the overpayments continued. When Unum terminated Gilchrest's benefits, it also demanded reimbursement for the overpayments in the amount of $3,564. Gilchrest responded that he did not have the money to refund the overpayments.

This action, commenced by Gilchrest in October 2005, challenged Unum's termination of benefits. Unum counterclaimed seeking to recover the overpayments under theories of breach of contract and unjust enrichment. The parties filed cross-motions for judgment on the administrative record, and the district court granted judgment in favor of Unum on the grounds that Unum's decision to terminate LTD benefits was not arbitrary or capricious.[FN1] Cross-motions for summary judgment subsequently filed with respect to Unum's counterclaim presented only one contested issue: whether the counterclaim was one brought by a fiduciary seeking "other equitable relief" under 29 U.S.C. § 1132(a)(3)(B). *Sereboff v. Mid Atl. Med. Servs., Inc.*, 126 S.Ct. 1869 (2006); *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204 (2002). Finding that Unum could proceed under § 1132(a)(3)(B), the district court entered judgment in favor of Unum on its counterclaim. Gilchrest appealed from both orders.

> FN1. The district court also found that the case should be remanded to Unum for exhaustion of administrative remedies on the issue of whether Gilchrest was totally disabled from "any gainful occupation ." Unum did not object at the time, and does not mention or challenge that ruling on appeal.

II.

A. Standard of Review

A decision denying ERISA benefits is reviewed *de novo*, unless-as is the case here-the plan gives the administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan. *Kalish v. Liberty Mut./Liberty Life Assur. Co.*, 419 F.3d 501, 506 (6th Cir.2005). When the plan gives the administrator such discretion, the termination of benefits is reviewed under the arbitrary and capricious standard. *Id.* (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)). Under this deferential review, the administrator's decision will not be deemed arbitrary and capricious "so long as 'it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome.' " *Id.* (quoting *Davis v. Ky. Fin. Cos. Ret. Plan*, 887 F.2d 689, 693 (6th Cir.1989)). In addition, as the district court observed, because Unum operates the Plan as both the administrator determining which claims are covered and the insurer responsible for paying those claims, there is a readily apparent conflict of interest. This inherent conflict does not alter the standard of review, but must be weighed as a factor in determining whether the decision was arbitrary and capricious. *Id.* (citing *Firestone*, 489 U.S. at 115).

B. Regular Occupation

During the initial period of LTD coverage for an employee's disability from his "regular occupation," disability is defined to mean that the employee is "**limited** from performing the **material and substantial duties** of [his] **regular occupation** due to [his] sickness or injury[.]" The term "material and substantial duties" is defined to mean duties that "are normally required for the performance of your regular occupation" and "cannot be reasonably omitted or modified."The Plan further provides

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 3037239 (C.A.6 (Ohio))
**(Cite as: Slip Copy)**

Page 3

that:
**\*3 REGULAR OCCUPATION** means the occupation you are routinely performing when your disability begins. Unum will look at your occupation as it is normally performed in the national economy, instead of how the work tasks are performed for a specific employer or at a specific location.

The question in this case is whether it was arbitrary and capricious for Unum to conclude from the evidence in the administrative record that Gilchrest's "regular occupation" did not require lifting of more than 25 pounds.

The first correspondence Unum received was the "Employer Statement" submitted by GLC in November 2003 as part of Gilchrest's claim for benefits. That form, completed by Linda Barckett, a benefits administrator for GLC, identified Gilchrest's "Job Title/Major Job Duties" as "Assistant Site Manager-see job desc[ription]." Immediately under that line, Barckett checked a box indicating that Gilchrest's "Occupational Classification" was "Medium 21-50 lbs." The referenced job description, on the other hand, included among the physical demands of the job that "[t]he employee must frequently lift and/or move up to 10 pounds and occasionally lift and/or move 25 pounds."This would place the job of Assistant Site Manager in the category of "light" exertional work. This discrepancy did not escape Unum, and Unum contacted Barckett for clarification regarding the exertional requirements of Gilchrest's job. In response, Barckett advised Unum's representative that, in fact, Gilchrest performed "heavy duty work (including heavy lifting) regularly due to the fact [that] he work[ed] at remote sites by himself."[FN2]

> FN2. Unum suggests on appeal that this apparent discrepancy is technically not inconsistent because a 25-pound lifting requirement would fall within the range of 21 to 50 pounds. This post-hoc rationalization is completely implausible given the clarification by Barckett that Gilchrest's work involved "heavy lifting."

As noted earlier, Unum had vocational rehabilitation consultant Christy Searcy, M.S., C.R.C., perform an occupational analysis to determine Gilchrest's "regular occupation" in June 2004. Whatever information may or may not have been provided to Searcy, it is clear that her conclusions were based on the comparison of the duties identified in GLC's job description for "Assistant Site Manager" and the DOT's description of the occupation of "Warehouse Manager." The GLC's three-page job description identified the following Essential Duties and Responsibilities:

Maintains, within the confines of assigned work areas, strict adherence to safety, environmental, and security laws, regulations, and requirements as set forth by the company, local hosts, and all applicable government directives. Reports observed violations to the Site Manager.

Assists the Site Manager in adhering to company procedures for the acceptance, receiving, positioning, and security of all inventory received by the company at the places of assigned responsibility.

Inventories delivery orders with the designated DRMO-CV Rep. Ensures inventory being accepted on designated Delivery Order Manifests is accounted for. Records this information and provides immediate reports as directed by the Site Manager.

Prepares inventory in accordance with the Field Operations Handbook to ensure the sales revenue goals are achieved.

**\*4** Manages inventory to include aging, scrap, and data input to ensure an inventory accuracy rate of 95% or better.

Ensures 100% accuracy of all data input into One-World.

Accounts for and protects company property and inventory at all times. Performs duties of Site Manager in his/her absence.

Other duties as may be assigned.

The "Supervisory Responsibilities" included that an Assistant Site Manager "[m]ay directly supervise employees and may also be called upon to direct or guide the efforts of temporary or contract workers."Finally, as noted earlier, the physical demands included the ability to do light work. Searcy found similarities between this job description and the fol-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

lowing description of the occupation of "Warehouse Manager":**184.167-114 MANAGER, WAREHOUSE (any industry) alternate titles: storekeeper; superintendent, storage area; superintendent, warehouse; warehouse supervisor** Directs warehousing activities for commercial or industrial establishment: Establishes operational procedures for activities, such as verification of incoming and outgoing shipments, handling and disposition of materials, and keeping warehouse inventory current. Inspects physical condition of warehouse and equipment and prepares work order for repairs and requisitions for replacement of equipment. Confers with department heads to ensure coordination of warehouse activities with such activities as production, sales, records control, and purchasing. Screens and hires warehouse personnel and issues work assignments. Directs salvage of damaged or used material. May participate in planning personnel-safety and plant-protection activities. GOE: 11.11.03 STRENGTH: L [Light] GED: R4 M3 L4 SVP: 8 DLU: 88.

http://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOT01E.HTM.

Since the Plan defined "regular occupation" with reference to how the occupation is performed in the national economy, Unum argues it was not arbitrary or capricious for Unum to look to the DOT for analogous occupations. *Osborne v. Hartford Life & Accident Ins. Co.,* 465 F.3d 296, 299 (6th Cir.2006), *petition for cert. filed,* 75 U.S.L.W. 3557 (U.S. Apr. 5, 2007) (No. 06-1350). Moreover, had GLC's job description been the only evidence in the record concerning Gilchrest's regular occupation, there would be little basis to argue that Unum's decision was arbitrary and capricious. For Unum's decision to pass muster under our deferential review, however, it must be consistent with the quantity and quality of the evidence in the record. *Moon v. Unum Provident Corp.,* 405 F.3d 373, 381 (6th Cir.2005). This record reveals that Unum ignored or disregarded undisputed evidence that Gilchrest was not performing the occupation defined by GLC's job description.

From the beginning, as even Unum recognized, there was a material discrepancy regarding the exertional requirements of Gilchrest's job as reflected in the Employer Statement and the referenced job description. Upon clarification, Unum was advised that Gilchrest had to do heavy lifting because he worked alone going to remote sites. Unum learned from early conversations with Gilchrest that the job required "lots of walking, driving a forklift, loading trucks, and lifting up to 80 lbs. without assistance." In later correspondence to Unum, Gilchrest wrote:

\*5 I can't walk any great distance, drive a forklift, lift computers, monitors, tv's, microwaves, 2 1/2 ton truck parts such as generators, starters and other products that we sell that [are] heavy. Please go to www.govliquidation.com to review the type of products we have to palletize, display and photograph.

Unum was also provided Gilchrest's statements to the Social Security Administration reporting that in his work for GLC, he frequently lifted 25 to 30 pounds, occasionally lifted as much as 85 or 90 pounds, and would typically carry items no more than a couple of feet. This was consistent with Gilchrest's explanation that he regularly lifted the inventory onto pallets before using a forklift to move them. The following is the only complete description in the record of the work Gilchrest was actually performing for GLC:Cl[aimant] had the assistant manager title because in order to sign for gov[ernment] surplus you had to be the manager or assistant manager of the site. Cl[aimant] said since he had to drive to bases to take delivery of surplus they also did not have to pay him overtime. Cl[aimant] would do this: Drive to base, inventory surplus, sign for it, load it onto trucks (using forklift), and go to next base. When back at sales site cl[aimant] would drive fork truck with a loaded pallet and move and sort the surplus onto pallets of similar items for display (by hand and using truck). After sale cl[aimant] would help load the pallets onto the customers truck for delivery (using fork truck) for the 4 days they had to pick items up after auction. Cl[aimant] would then help set up for the next sale or go to the bases again to pick up items.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Cl[aimant] did no hiring and no firing. Buying decisions were made by headquarters in another state. Cl[aimant] would be responsible for supervision of employees when site manager was on vacation or traveling (3 weeks out of 52).[W]hen the industrial truck job description was read[, claimant] verified 100% of tasks listed he did. When the Professional equipment manager position was read cl[aimant] verified he didn't really direct and control he did the jobs himself. Cl [aimant] said he did confer with customers on their needs and what was available[,] handle[d] complaints[, and] read trade publications.... Cl[aimant] did not plan and direct sales and service to new markets he was the one implementing the plan by going to the new markets.

In other words, despite his job title, Gilchrest did not perform the managerial work that characterized the job descriptions for "Assistant Site Manager" and "Warehouse Manager." He did not direct or control the work of others, did not make purchasing or marketing decisions, and did not coordinate warehouse activities except for a few weeks per year when the Site Manager was away. Rather, the material and substantial duties of his job were to drive to and from military bases, sign for and inventory surplus items, move the inventory on and off pallets by hand, and move pallets on and off trucks with a forklift.

*6 On this record, and keeping in mind that Unum is a conflicted administrator, we find that the disconnect between Gilchrest's job description and the occupation he was routinely performing made Unum's reliance on the analogy to "Warehouse Manager" arbitrary and capricious. To be clear, the fact that Gilchrest's work actually required lifting of more than 25 pounds is not dispositive, as it is conceivable that an Assistant Site Manager could be required by a particular employer to also perform tasks requiring medium or heavy lifting. Rather, this was only part of the evidence demonstrating that Gilchrest was not routinely performing the material and substantial duties of the occupation of "Assistant Site Manager" as that occupation is performed in the national economy. Finally, there can be no doubt on this record that Gilchrest's "regular occupation," whether defined as an industrial truck job or a warehouseman position, required him to lift more than 25 pounds. Unum's decision to terminate Gilchrest's LTD benefits on the grounds that he was not disabled from his "regular occupation" was arbitrary and capricious and Gilchrest was therefore entitled to LTD benefits from the date of termination through the "regular occupation" period.

III.

Appealing from the entry of summary judgment on Unum's counterclaim, Gilchrest argues that it was error for the district court to conclude that Unum was seeking "appropriate equitable relief" to enforce the reimbursement provisions of the Plan. 29 U.S.C. § 1132(a)(3)(B)(ii). Summary judgment is appropriate when there are no issues of material fact in dispute and the moving party is entitled to judgment as a matter of law. FED.R.CIV.P. 56(c). A decision granting summary judgment is reviewed *de novo*, as is a decision denying summary judgment on legal grounds. *Smith v. Ameritech*, 129 F.3d 857, 863 (6th Cir.1997); *McMullen v. Meijer, Inc.*, 355 F.3d 485, 489 (6th Cir.2004).

While the parameters of the authority of a fiduciary to sue under § 1132(a)(3)(B) have been the subject of several Supreme Court decisions setting forth the controlling principles, none of the cases involved an effort to recover overpayments made by a plan to a beneficiary. The cases all agree that to invoke the authority to sue under § 1132(a)(3)(B), a fiduciary must be seeking a category of relief that would have typically been available in equity and not simply an award of compensatory damages. *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 255-56 (1993). Elaborating on this distinction in *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002), the Court explained that not all relief falling under the rubric of restitution was available in equity. Rather, equitable restitution involves the imposition of constructive trust or equitable lien on "particular funds or property in the defendant's possession." *Id.* at 213. That requirement was not satisfied in *Knudson*, where Great-Life sought reimbursement for payment of medical expenses

Slip Copy
Slip Copy, 2007 WL 3037239 (C.A.6 (Ohio))
(Cite as: Slip Copy)

Page 6

through a lien against any settlement with third-party tortfeasors. The Court found that because the funds were placed into a special needs trust that was not in the Knudson's possession, the relief sought was "not equitable-the imposition of a constructive trust or equitable lien on particular property-but legal-the imposition of personal liability for the benefits that [Great-West] conferred upon [Knudson]"*Id.* at 214.

*7 Most recently, the Supreme Court clarified in Sereboff v. Mid Atlantic Medical Services, Inc., 126 S.Ct. 1869 (2006), that in addition to equitable restitution, § 1132(a)(3)(B) could also authorize a fiduciary's action to enforce an "equitable lien by agreement." Unlike in *Knudson,* the health insurance plan in *Sereboff* sought reimbursement from the portion of a third-party settlement which had been set aside in an investment account under the control of the Sereboffs. The Court explained that it had not rejected the claim in *Knudson* because it had alleged breach of contract, but because Great-West did not seek to recover a particular fund from the defendant.*Sereboff,* 126 S.Ct. at 1874. It is therefore immaterial that Unum's counterclaims were for breach of contract and unjust enrichment. In addition, the Court clarified that to establish an equitable lien by agreement, strict tracing of funds is not required and the fund need not have been in existence when the contract was executed. *Id.* at 1875-76.For this reason, Gilchrest's undisputed averment that the overpayments had been dissipated would seem to be of no avail. See also Popowski v. Parrott, 461 F.3d 1367, 1374 n. 8 (11th Cir.2006).

What is required, however, is that the agreement specifically identify a particular fund-distinct from the defendant's general assets-and a particular share of that fund to which the plan was entitled. *Sereboff,* 126 S.Ct. at 1875. In *Sereboff,* the health insurance plan included an "Acts of Third Parties" provision that applied if a beneficiary was injured as a result of the acts or omissions of another, which required a beneficiary who received benefits under the plan to "reimburse" the plan for those benefits from all recoveries from a third party. *Id.* at 1872.In other words, the plan specifically identified a particular fund distinct from the Sereboffs' general assets (all recoveries from a third party whether by lawsuit, settlement or otherwise) and a particular share of that fund to which the plan was entitled (the portion of the total recovery due for benefits paid).*Id.* at 1875.As a result, the Court held that Mid Atlantic could maintain an action for other appropriate equitable relief.[FN3]

> FN3. In so holding, the Supreme Court expressly abrogated Qualchoice, Inc. v. Rowland, 367 F.3d 638 (6th Cir.2004), and Westaff (USA), Inc. v. Arce, 298 F.3d 1164 (9th Cir.2002).

The Eleventh Circuit has had occasion to apply *Sereboff* in the context of two consolidated appeals, finding in the first case that the plan was seeking equitable relief and in the second that the plan could not proceed under § 1132(a)(3)(B).*Popowski,* 461 F.3d at 1373. In the first case, the plan expressly created a lien on any amount recovered from third parties and required repayment of the benefits paid "out of the recovery made from the third party or insurer."*Id.* at 1370.Also, unlike in *Knudson,* the settlement money was deposited in the defendant's bank account. In the second case, in contrast, the reimbursement provisions created a right to reimbursement in full but did not specify that repayment be made out of any particular fund distinct from the beneficiary's general assets. As *Popowski* illustrates, *Sereboff* requires us to examine the reimbursement provisions in question.

*8 Here, the Plan provided that disability benefits "may be reduced by deductible sources of income," including the amount the employee receives or is entitled to receive in Social Security disability benefits. Addressing overpayments, the Plan stated as follows:

Unum has the right to recover any overpayments due to:
-fraud;
-any error Unum makes in processing a claim; and
-your receipt of deductible sources of income.
You must reimburse us in full. We will determine

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the method by which the repayment is to be made. Unum will not recover more money than the amount we paid you.

At first blush, it seems that this language would not satisfy the requirements of *Sereboff* because there is no express lien against a specifically identified fund. When we pause to consider that Unum is seeking to recover overpayments, however, the provisions actually do satisfy the requirements of *Sereboff*. That is, the Plan's overpayment provision asserts a right to recover from a specific fund distinct from Gilchrest's general assets-the fund being the overpayments themselves-and a particular share of that fund to which the plan was entitled-all overpayments due to the receipt of Social Security benefits, but not to exceed the amount of benefits paid. See *Dillard's Inc. v. Liberty Life Assurance Co., 456 F.3d 894, 901 (8th Cir.2006)* (affirming summary judgment for plan seeking to recover overpayment of benefits resulting from the receipt of Social Security disability benefits).

IV.

For the reasons set forth above, we **AFFIRM** the entry of summary judgment in favor of Unum on its counterclaim to recover overpayments; **REVERSE** the district court's entry of judgment on the administrative record in favor of Unum; and **REMAND** for entry of judgment in favor of Gilchrest with respect to his claim for LTD benefits during the "regular occupation" period.

C.A.6 (Ohio),2007.
Gilchrest v. Unum Life Ins. Co. of America
Slip Copy, 2007 WL 3037239 (C.A.6 (Ohio))

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.